Thomas L. Williams v. Commissioner.
Williams v. Commissioner
Docket No. 27732.
United States Tax Court
1953 Tax Ct. Memo LEXIS 357; 12 T.C.M. (CCH) 186; T.C.M. (RIA) 53063; February 24, 1953
Daniel A. Taylor, Esq., Joseph B. Crowley, Esq., and John F. Kelly, Jr., Esq., for the petitioner. Harold H. Hart, Esq., and Paul Levin, Esq., for the respondent. JOHNSON Memorandum Findings of Fact and Opinion JOHNSON, Judge: Respondent determined a deficiency in income tax for the year 1944 in the amount of $183,397.06. The issues before us are as follows: (1) In a corporate reorganization, was the receipt of stock by petitioner a taxable dividend? (2) In the alternative, if the transaction was not tax free, is the gain taxable as a long-term capital gain? (3) Again, in the alternative, if the transaction resulted in an ordinary *358 dividend to the petitioner, is the amount of taxable income limited to the available earnings and profits of the distributing corporation? Findings of Fact Part of the facts were stipulated and are so found. During the year 1944 petitioner resided in Chicago, Illinois, and filed his individual income tax return with the collector of internal revenue for the first district of Illinois, at Chicago. The petitioner reported his income for the calendar year on the cash basis. From 1921 to 1939, petitioner, as a sole proprietor, conducted a business for the packaging and distribution of eye beauty preparations. The business was conducted in leased quarters on the first floor of a building located at 5900 North Ridge Avenue, Chicago (hereinafter referred to as the Building). On or about July 1, 1939, petitioner incorporated the Maybelline Company (hereinafter sometimes referred to as the Company), under the laws of Illinois. The Company had an authorized capital of $300,000, consisting of 15,000 shares of $20 par value common stock. On or about July 1, 1939, petitioner conveyed and transferred the assets of his sole proprietorship to the Company in exchange for 4,998 shares of *359 its $20 par value stock in a tax-free exchange. One share each was also issued to two other individuals, but the remaining 10,000 shares have never been issued. The parties fixed the net value of the assets transferred as $100,000; the net cost of these assets to the petitioner was $85,335.32. Petitioner has been the sale stockholder (except for two shares), and president of the Company since its incorporation. His primary interest in the operation of the Company has been with the advertising and promotion of the Company's products. In the year 1944 the employees, exclusive of executives, numbered between 50 and 55. In February 1940 the Board of Health of the City of Chicago advised the Company that it must improve its premises to provide proper ventilation for its employees. On December 20, 1940, the Company's license to do business in the Building was revoked because the ventilation had not been improved. The Company began a search for other suitable space. The Company's officers consulted real estate brokers, architects and engineers. In their search they inspected various tracts of real property; they also examined sketches and plans for a proposed new building. The officers *360 discussed the possibility of the lessor remodeling the Building; this was to no avail. The management was not satisfied with any of these proposed changes. The agent who managed the Building for the lessor suggested that the Company buy the Building and remodel it. After some negotiations, on or about February 27, 1941, the Company purchased the Building. The purchase price was $182,000; the consideration was in cash and a mortgage for $107,838.86. The Building contained three stories and a basement. There were 23 stores on the street level and 52 apartments upstairs. At the time of purchase, and for some years before, petitioner occupied approximately 14 per cent of the total space in the Building; this was 8 of the stores and the storage space behind the stores. After the purchase of the Building the Company immediately began alterations. It extended its floor space by adding two more stores, cut a stairway through to the second floor where four apartments were converted into executive, bookkeeping and business offices. After the alterations the Company occupied approximately 20 per cent of the Building, and now there were 13 stores on the street level and 47 apartments upstairs. *361 The Company spent $41,158.69 for these changes. Several months prior to June 30, 1944, the officers of the Company discussed the problem of separating the beauty business from the real estate business. In these discussions the Company's accountant pointed out various difficulties encountered by him in properly accounting for the combined businesses. In his opinion, the Company, under the articles of incorporation, was not authorized to operate an apartment building. It was also pointed out that there were problems with some of the apartment tenants, and that these problems interfered with the Company's business. As a result of these discussions the officers decided to separate the realty operations from the beauty business. Tax counsel was consulted with regard to the proposed separation. In accord with his advice, the following resolutions were adopted on June 30, 1944, at a special meeting of the board of directors: "RESOLVED that Maybelline Co. adopt the following Plan of Reorganization: "I. The corporation shall presently cause to be formed an Illinois corporation to be known as 'Maybelline Building Corporation' with common capital stock of the par value of $20.00 per share. *362 "II. This corporation shall offer to exchange with Maybelline Building Corporation for 6000 shares of its capital stock to be issued to this corporation as fully paid and non-assessable good, merchantable title to land, building and appurtenances now owned by this corporation and known as 5900-14 North Ridge Avenue, Chicago, Illinois. Said conveyance shall be made subject to the indebtedness of this corporation in respect of such premises and appurtenances in the amount of $89,013.61, which indebtedness is secured by Trust Deed and Chattel Mortgage of record. Rents, interest, insurance, water charges and the like charges pertaining to the building shall be prorated between the grantor and grantee based on the date of conveyance, June 30, 1944. The 1944 taxes shall be paid by Maybelline Co. "III. Upon the receipt of the 6000 shares of stock aforementioned Maybelline Co. shall exchange with its shareholders the said 6000 shares of stock of Maybelline Building Corporation for common stock of Maybelline Co. The ratio of the exchange shall be one share of Maybelline Co. stock for five shares of Maybelline Building Corporation stock. In the exchange each shareholder of the corporation *363 shall have the right to receive his pro rata share of the stock of Maybelline Building Corporation. "IV. The shares of stock of Maybelline Co. received by the corporation in the exchange provided for in Paragraph III of this resolution shall be held by the corporation as treasury stock." The shareholders of the Company, who were also the directors, ratified and approved the plan of reorganization. On June 28, 1944, the Maybelline Building Corporation (hereinafter referred to as the Building Corporation) was organized under the laws of the State of Illinois with an authorized capitalization of $150,000, consisting of 7,500 shares of $20 par value common stock. The building was conveyed to the Building Corporation and 6,000 shares of stock in the Building Corporation were issued to the Company. The Company immediately transferred the 6,000 shares to the petitioner and petitioner then transferred to the Company 1,200 shares of its own stock. After the transfer of the Building, the Company began to pay an annual rental of $19,200 to the Building Corporation. This was a proper and reasonable rent charge. The fair market value of the Building on June 30, 1944, was $287,500; the Company's *364 equity in the Building was $198,486.39. The fair market value of 6,000 shares of the Building Corporation stock on that date was $198,486.39. The earned surplus of the Company as of June 30, 1944, was $150,054.66. Petitioner received 6,000 shares of Building Corporation stock in exchange for 1,200 shares of Company stock in pursuant of a plan of reorganization in which the Company and the Building Corporation were parties to the reorganization. Petitioner realized no gain or loss in the exchange. Opinion The only issue before us is whether the petitioner's exchange of Company stock for Building Corporation stock was taxable and, if so, how. Petitioner contends that the transaction was pursuant to a plan of reorganization and that no gain or loss is to be recognized under section 112 (b) (3) and (g) (1), I.R.C.[1] Alternatively, petitioner contends that the 1,200 shares of the Company's stock were surrendered in partial liquidation within the meaning of section 115 (c) and (g) and that the gain or loss on the transaction was recognizable under section 117 as a capital gain or loss. As a second alternative, if the transaction is taxable to petitioner, he contends *365 that a corporate distribution is taxable as dividend income only to the extent of available earnings and profits in the year of distribution. On the other hand, respondent has determined that the distribution of the Building Corporation stock constituted a distribution of a property dividend and is taxable to the petitioner. Respondent also contends that the transaction was such as to make the distribution essentially equivalent to a dividend pursuant to *366 section 115 (g). [2] He further contends that there were sufficient earnings and profits present in the Company so that the fair market value of the property distributed is taxable as a dividend at ordinary income rates. The type of reorganization which we have before us is sometimes called a "split-off". In Chester E. Spangler, 18 T.C. 976, (promulgated September 10, 1952), we considered the same type of reorganization, and determined that no gain or loss was recognized on the exchange. Briefly, in the instant case, the reorganization was as follows: The Company transferred part of its assets *367 (the Building) to a new corporation, the Building Corporation, for stock of the Building Corporation. The Company then distributed the Building Corporation's stock to the petitioner in exchange for some of its own stock to complete the reorganization. When we recognize that the form of reorganization met the formal requirements of section 112 (b) (3), that there was a business purpose other than the avoidance of taxes, that petitioner's property interest subsequent to the reorganization was identical to that before, that there was a continuity of the corporate business, and that the reorganization was made pursuant to a plan of reorganization, we can only conclude that petitioner realized no gain or loss as the result of the reorganization. Chester E. Spangler, supra. In view of our holding that petitioner realized no gain or loss in this reorganization, there is no need to discuss respondent's contentions based on section 115 (a) (g) and (j). Our holding that this was a section 112 (b) (3) reorganization is diametrically opposed to the theory that there was a taxable distribution by the Company under section 115. Decision will be entered for the petitioner. Footnotes
1. SEC. 112. RECOGNITION OF GAIN OR LOSS. * * *
(b)(3) Stock for Stock on Reorganization. - No gain or loss shall be recognized if stock or securities in a corporation a party to a reorganization are, in pursuance of the plan of reorganization, exchanged solely for stock or securities in such corporation or in another corporation a party to the reorganization. * * *
(g) Definition of Reorganization. - As used in this section * * * (1) The term "reorganization" means * * * (D) a transfer by a corporation of all or a part of its assets to another corporation if immediately after the transfer the transferor or its shareholders or both are in control of the corporation to which the assets are transferred, * * *↩
2. SEC. 115. DISTRIBUTIONS BY CORPORATIONS. * * *
(g) Redemption of Stock. - If a corporation cancels or redeems its stock (whether or not such stock was issued as a stock dividend) at such time and in such manner as to make the distribution and cancellation or redemption in whole or in part essentially equivalent to the distribution of a taxable dividend, the amount so distributed in redemption or cancellation of the stock, to the extent that it represents a distribution of earnings or profits accumulated after February 28, 1913, shall be treated as a taxable dividend.↩